UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
VALENTIN ADIA,

        Plaintiff,

  -against-

MTA LONG ISLAND RAIL ROAD COMPANY,

        Defendant.
----------------------------------------------------------------------x

**OPINION & ORDER**
02-CV-6140 (DLI)(MDG)

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff, Valentin Adia, brings this action against the defendant, MTA Long Island Railroad Company ("LIRR") alleging: (1) age-based discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (2) national-origin based discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (3) retaliation in violation of the ADEA and Title VII. Plaintiff also alleges analogous state and local law violations under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"). LIRR now moves for summary judgment. For the reasons set forth below, defendant's summary judgment motion is granted.

**I. Facts**

    **A. Plaintiff's Employment with LIRR**

Plaintiff was employed with defendant, LIRR from 1986 until his termination in 2002. (Def.'s Rule 56.1 Statement of Material Uncontested Facts ("Def.'s 56.1") at ¶¶ 1, 88.) Plaintiff, age 55 at the time of his termination, is of Filipino ancestry. (Adia Dep. at 5.) In April 1986, plaintiff began work as a Budget Administrator in LIRR's Capital Budgets Department. (Def.'s 56.1 at ¶ 1.) In March 1992, plaintiff was promoted to Financial Systems & Network Administration

Manager in LIRR's Finance Department. (*Id.* at ¶ 3.) From 1998 to 2000, Controller Jerome Cavana ("Cavana") directly supervised plaintiff. (*Id.* at ¶ 4.) In February 2001, LIRR hired Kim Porcelain ("Porcelain") to succeed Cavana as Controller and as plaintiff's immediate supervisor. (*Id.* at ¶¶ 4-5.) Porcelain is of Chinese and Vietnamese ancestry and was 33 years of age at the time of plaintiff's termination. (*Id.* at ¶ 20; Porcelain Dep. at 7.)

Plaintiff alleges that while working under Porcelain, he was discriminated against and treated dissimilarly from his colleagues. (Pl.'s Am. Compl. at ¶ 19.) Specifically, Porcelain allegedly gave plaintiff unrealistic project deadlines and unnecessarily berated and criticized him in front of co-workers. (Adia Dep. at 26-34, 70.) Plaintiff contends that, on two or three occasions, Porcelain made comments about plaintiff's failure to remember assigned tasks and frequently asked if he "understood English." (Pl.'s Am. Compl. at ¶ 49; Pl.'s Rule 56.1 Counterstatement ("Pl.'s 56.1") at ¶ 102.)

In September 2001, Porcelain received a call from Mel Braverman ("Braverman"), president of Morellato Inc., complaining of the poor consulting services plaintiff provided to Morellato. (Def.'s 56.1 at ¶¶ 59-60.) Procelain informed LIRR's Vice President and Chief Financial Officer, Nicholas DiMola ("DiMola") of Braverman's call. (Def.'s 56.1 at ¶¶ 60, 63, 66). Beginning in November 2001, Porcelain began regularly counseling plaintiff on his work performance to ensure that plaintiff was working on his assigned LIRR projects. (*Id.* at ¶ 64.) Porcelain often observed plaintiff performing non-LIRR related work and overheard plaintiff talking on the telephone concerning non-LIRR related business. (Porcelain Aff. at ¶¶ 30-31.)

### B.     Plaintiff's March 2002 Performance Review and Peer Review.

In early March 2002, Porcelain formally reviewed plaintiff's work performance and issued him an overall rating of "1" ("unacceptable") on a scale of 1 to 5. (Def.'s Aff Ex. J; Def.'s 56.1 at ¶ 37.) Porcelain indicated that plaintiff exhibited a "lack of cooperation" and failed to achieve results. (*Id*. at ¶¶ 37-38.) Porcelain also found plaintiff's work "unstructured" and "counterproductive." (*Id*.) In an accompanying memorandum, Porcelain noted that (1) plaintiff's responsibilities as Financial Systems Manager "[were] not being performed to an acceptable level of quality work;" . . . (2) "projects under [plaintiff's] supervision [were] poorly managed, [and did] not follow Information Systems standards and experience[d] delays;"(3) "[plaintiff's] overall systems project ownership, management, organization, coordination [] and reporting [were] poor and need[ed] considerable improvement;" and (4) "[plaintiff's] ability to provide information in an honest and timely manner [was] lacking and therefore, raise[d] great concern and require[d] considerable and immediate improvement." As a result of plaintiff's poor performance, he was placed on 90 days probation in late March. (Adia Dep. at 70.) Plaintiff notes that he never received a performance review rating below 3.5 (satisfactory) prior to this performance review. (Def.'s 56.1 at ¶ 36; Pl.'s 56.1 at ¶ 37.)

Plaintiff then met with the Executive Director of Human Resources, Rosanne Neville ("Neville"), to discuss plaintiff's performance review.[1] (Pl.'s 56.1 at ¶ 42.) Neville suggested plaintiff prepare a report for DiMola indicating why plaintiff believed his performance review was unjustified. (Adia Dep. at 58.) After meeting with plaintiff, DiMola established a peer review committee to conduct an independent review of plaintiff's work performance. (Def.'s 56.1 at ¶ 44-45.)

---

[1] Plaintiff indicates that he made his first internal complaint of discrimination in November 2001. (*See* Pl.'s Aff. at ¶ 18.)

The peer review committee was composed of a 55-year-old representative from the Finance Department and a 60-year-old representative from the Information Services Department. (*Id.* at ¶¶ 47- 51.) Plaintiff alleges that the performance review was not based upon his "performance as a whole but solely on his work on the 'SDLC,' [a specified computer] system" for which plaintiff received no training. (Pl.'s 56.1 at ¶ 40.) Plaintiff further alleges that he previously informed Porcelain of his lack of training or familiarity with the system. (Adia Dep. at 70, Velez Aff. at ¶¶ 4, 6.) Porcelain participated in two peer review committee meetings before Neville removed Porcelain from the committee to relieve the "pressure" on plaintiff. (Adia Dep. at 74-75.)

Ultimately, the peer review committee concluded that plaintiff "[did] not have the necessary skills, training, and/or experience to meet the IT related job requirements as outlined in his Job Description Questionnaire." (Def.'s 56.1 at ¶ 58.) Specifically, the committee concluded that "[plaintiff's] systems development approach did not conform to LIRR technology standards, causing him to miss target dates and produce sub-quality deliverables." (*Id.* at ¶¶ 55.) The committee further concluded that plaintiff's "project implementations were chaotic and beleaguered with problems resulting from his flawed approach and lack of appropriate documentation" and that plaintiff "spent far too much time blaming his subordinates and others for his performance problems and looking for justification to bypass LIRR standards, time that should have been expended on quality systems and analysis and design." (Id. at ¶¶ 56-57.)

### E. MTA Investigation

In mid-March 2002, Porcelain also met with DiMola to discuss plaintiff's performance review and informed DiMola that Porcelain observed plaintiff working on non-LIRR related business during work hours. (Porcelain Aff. at ¶ 32.) Based on this information and plaintiff's poor

performance review, around March 20, 2002, DiMola requested that the MTA Auditor General's Office investigate plaintiff. (Def.'s 56.1 at ¶¶ 67-69.)

The MTA investigation consisted of: (1) analyzing plaintiff's work phone records from February 1, 2001 to April 15, 2002 for non-LIRR related calls; (2) interviewing the executives of frequently called companies; (3) analyzing plaintiff's computer hard drives at LIRR for evidence of inappropriately stored or referenced material; (4) reviewing plaintiff's internet usage at LIRR for selected days; (5) reviewing various financial records of the two companies found on LIRR hard drives; and (6) interviewing key LIRR officials. (Def.'s 56.1 at ¶ 77.)

Meanwhile, on April 30, 2002, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging age and national origin discrimination. (Johnson Aff. Ex. D.) Later, the EEOC issued a report stating that it was unable to conclude that the information presented constituted a statutory violation. (*Id.*)

On May 2, 2002 the MTA concluded its investigation and reported its findings to DiMola, Neville, and Porcelain. (*Id.* at ¶ 72.) The MTA concluded that plaintiff conducted business using LIRR resources for three outside companies, including Morellato Inc. ("Morelatto"), DiMatteo Distributors ("DiMatteo"), and MAB Finer Wines and Spirits ("MAB"). (*Id.* at ¶ 78). Specifically, the MTA investigation revealed the following:

With respect to Morellato, the MTA Investigation found: (1) 49 calls made to Morellato from the plaintiff's LIRR telephone extension; (2) cancelled checks indicating Morelatto paid $4,175 to plaintiff from June 2001 through August 2001 for computer consulting services; (3) correspondence between plaintiff and Morellato on plaintiff's computer at LIRR evidencing plaintiff's significant

involvement in Morellato's business; and (4) that Morelatto had hired plaintiff as a computer consultant. (*Id.* at 79.)

With respect to DiMatteo, the MTA Investigation revealed: (1) 145 calls made to DiMatteo from plaintiff's LIRR telephone extension; (2) that plaintiff maintained corporate financial records for DiMatteo (including disbursements, ledgers, etc.) on his LIRR computer; (3) vendor records indicating that plaintiff was paid between $2,000 and $6,000 annually from 1996 to 2001. (Def.'s 56.1 at ¶ 80).

With respect to MAB, the MTA Investigation found: (1) 154 calls made to MAB from plaintiff's LIRR telephone extension; (2) that plaintiff and his ex-wife's nephew, Romulo Landas ("Landas"), who was also employed with LIRR, were working together for MAB; (3) a Point of Sale system developed for MAB on Landas' computer at LIRR; and (4) that plaintiff paid Landas $1,000 for Landas' work. (Def.'s 56.1 at ¶ 81).

MTA investigators also concluded that plaintiff had failed to disclose any income generated from outside employment for the 2000 calendar year on his annual statement of financial disclosure as required by the New York State Ethics Commission. (*Id.* at ¶ 82.)

On May 3, 2002, the MTA Auditor General's Office informed DiMola that it had obtained a signed statement from Landas stating that: (1) from October 2000 to March 2002 plaintiff regularly pressured Landas to work on MAB projects at LIRR; (2) MAB paid plaintiff $4,500 for work on such projects; and, (3) Landas and plaintiff once left work in the middle of the day to work for MAB. (DiMola Aff. Ex. N.)

On May 7, 2002, DiMola terminated plaintiff citing the MTA investigation's findings and plaintiff's deficient job performance. (*Id.* at ¶ 88.) As further grounds for plaintiff's termination,

LIRR cites the fact that the plaintiff hired Landas and failed to report the relationship to the Human Resources Department pursuant to LIRR policy. (*Id.* at ¶ 32, DiMola Dep. at 79-80.) Plaintiff contends that, while he participated in Landas' interview, plaintiff was never provided with a copy of the employment application and ultimately Cavana hired Landas. (Pl.'s 56.1 at ¶ 32.)

Defendant further contends that, even if the plaintiff had not been terminated in May 2002, he would have been terminated once LIRR discovered that plaintiff failed to notify the LIRR of his divorce and continued to accept employment benefits on behalf of his ex-wife.[2] (Def.'s 56.1 at ¶ 131.) Plaintiff disputes these allegations and claims that the LIRR was aware of the divorce and of the fact that plaintiff's LIRR pension was subject to a lien in favor of plaintiff's ex-wife. (Pl.'s 56.1 at ¶ 112.)

On August 27, 2002, the EEOC issued plaintiff a "Right to Sue" letter. (Johnson Aff. Ex. E.) On November 13, 2002, plaintiff filed a complaint in the instant action. Thereafter, plaintiff filed an amended complaint on February 24, 2003. (Johnson Aff. Ex. A.) Defendant joined issue on March 4, 2003 denying all claims. (Def.'s Answer to Am. Compl.) On February 4, 2005, defendant filed the instant motion for summary judgment.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Accordingly, the court's task is not to "weigh the evidence and determine the truth

---

[2] Plaintiff was divorced from his wife since 1999. However, defendant contends that it first learned of the divorce at the time of plaintiff's termination. (Def.'s 56.1 at ¶ 131.)

of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248; *see also Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir. 1991).

The Second Circuit has recognized that courts must be cautious when granting summary judgment in employment discrimination cases because the employer's intent is frequently at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1998); *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F2d 989, 998 (2d Cir. 1989). However, the Second Circuit has maintained that summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases." *Abdu Brisson v. Delta Airlines Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.,* 475 U.S. at 586. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249-50. "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (internal citations omitted).

### B. Age and National Origin Discrimination

Pursuant to Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). The ADEA

makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995). All individuals 40 years of age and above are members of a "protected class" under the ADEA. 29 U.S.C. § 631(a).

In Title VII and ADEA cases, where there is no direct evidence of discrimination, the plaintiff's claims are analyzed under the burden-shifting model set forth in *McDonnell Douglas Corp. v Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See Abdu Brisson*, 239 F.3d 456, 466 (2d Cir. 2001); *Schnabel v. Abramson*, 232 F.3d 83, 87 (2d Cir. 2000). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of proving a prima facie case of discrimination. *Id.* To establish a prima facie case, the plaintiff must show that (1) he is a member of a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Abdu Brisson*, 239 F.3d at 466.

The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The burden at this stage is one of production, not persuasion. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Once the defendant meets this burden, "the presumption of discrimination 'drops out of the picture.'" *Id.* at 511. The burden then shifts back to the plaintiff to present sufficient evidence to permit a rational finder of fact to infer that the defendant's proffered reason is a pretext and that "the employment decision was more likely than not based in whole or in part on discrimination." *Stern v. Trustees of Columbia Univ. in the City of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

### 1. Plaintiff has Failed to Establish a *Prima Facie* Case

Here, plaintiff established the first three prongs of a prima facie case: (1) plaintiff is over 40 years of age and of Filipino decent, and, thus, in a protected class, 42 U.S.C. 2000e, 29 U.S.C. §631(a); (2) plaintiff is assumed to be qualified because he worked for LIRR for sixteen years and held the same position for a number of years prior to his discharge, *see Eng v. Beth Israel Med. Ctr.*, No. 93 Civ. 3605, 1995 WL 469704, *2 (S.D.N.Y. Aug. 7, 1995) (presuming employee employed with defendant for eight years qualified for the position); and (3) plaintiff was terminated, suffering an adverse employment action. *See Galabya v. New York City Bd. of Ed.*, 202 F.3d 636 (2d Cir. 2000). However, plaintiff fails to demonstrate that his termination occurred under circumstances giving rise to an inference of discrimination.

In order to establish the final element of a prima facie case of age or national origin discrimination, plaintiff must offer evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." *Marlow v. Office of Court Admin. of State of New York*, 820 F.Supp. 753, 758 (S.D.N.Y. 1993) (quoting *Intern. Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 1866, 52 L. Ed. 2d 396 (1977). While courts have held that there is no single way to establish "circumstances giving rise to an inference of discrimination," it is clear that there must be sufficient evidence of a causal connection between plaintiff's termination and his age or national origin. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37-38 (2d Cir. 1994). A number of circumstances may contribute to a permissible inference of discriminatory intent including:

> "[t]he employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of

employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or the timing of the discharge."

*Id.* at 37 (internal citations omitted).

In this case, plaintiff alleges that Porcelain's remarks, "how come you forget these things" and "speak English," along with plaintiff's personal feeling that he was "singled out," satisfy the requirement of circumstances giving rise to an inference of age and national origin discrimination. (Pl.'s 56.1 at ¶ 102). However, "'stray remarks' alone do not support a discrimination suit." *Danzer v. Norden* 151 F.3d 50, 56 (2d Cir. 1998) (citing *Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2d Cir. 1994)). Furthermore, plaintiff's subjectively held beliefs regarding allegedly discriminatory comments are not sufficient to support an inference of discrimination. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (finding no inference of discrimination where plaintiff alleged that her supervisor "smiled at her less approvingly"); *D'Cunha v. New York Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445, 2006 WL 544470, at *7 (E.D.N.Y. Mar. 6, 2006) (finding supervisor's remarks of "I have many things on you" and "I'll get you" and plaintiff's observation that supervisor attitude was "scary", insufficient to support an inference of discrimination to survive summary judgment); *Gorley v. Metro-North Commuter R.R.*, No. 99 Civ. 3240, 2000 WL 1876909, at *7 (S.D.N.Y. Dec. 22, 2000) (finding "[e]ven if [employer] did harbor personal animosity against plaintiff, Title VII provides relief only for racial discrimination, not fickleness."). Here, Porcelain's comments, at best, constitute stray remarks and do not directly relate to plaintiff's age or national origin.

Plaintiff also contends that in the fifteen years of his employment with LIRR, he never received a below satisfactory performance review until he worked under Porcelain. However, courts have held that prior satisfactory evaluations do not tend to show termination based on

discrimination. *Viola v. Philips Med. Sys.*, 42 F.3d 712, 718 (2d Cir. 1994); *D'Cunha*, 2006 WL 544470, at *6 (holding that prior good reviews and letters of recommendations did not show that plaintiff's transfer and suspension was a product of discrimination). Thus, this evidence, without more, fails to establish circumstances giving rise to an inference of discrimination.

Moreover, plaintiff claims he "felt singled out" by Porcelain but presents no evidence of disparate treatment. "In order to be probative of discrimination, evidence must show that the employer treated differently employees similarly situated in all material respects." *Gorley*, 2000 WL 1876909, at *7. Here, plaintiff has not demonstrated that similarly situated co-workers were treated differently. In fact, from 2000 to 2005, Porcelain promoted two individuals over 40, approved the hire of two individuals over 40 and promoted a Filipino individual, further undermining any inference of discrimination on the basis of age or national origin. *See* Def.'s 56.1 at ¶¶ 10-11-18-19; Porcelain Dep. at 7-8; *see also Renz v. Grey Advertising*, 135 F.3d 217, 220 (2d Cir. 1997) (affirming summary judgment in part in age discrimination case because plaintiff offered no supporting statistical evidence concerning the age of other employees in supervisor's group). Furthermore, Landas, who is under 40 and outside the protected age group, was asked to resign for the same reasons plaintiff was terminated. (Def.'s 56.1 at ¶ 89-90).

Additionally, any inference of discrimination is further undermined by the fact that it was DiMola's decision to terminate plaintiff, not Porcelain's. The case law establishes that "as a general matter, stray comments are not evidence of discrimination if . . . they are made by individuals without decision-making authority." *Gorley*, 2000 WL 1876909, at *6; *see also O'Connor v. Viacom*, 104 F.3d 356, 1996 WL 722620, *3 (2d Cir. 1996). Thus, even if a rational factfinder could

infer that Porcelain's comments were discriminatory, such comments fail to establish a prima facie case because Porcelain did not have the ultimate authority to terminate plaintiff.

Moreover, plaintiff's position was eliminated after his termination. The fourth element of a prima facie case is typically satisfied if the plaintiff is replaced by an individual outside of his protected class. *See McDonnell Douglas*, 411 U.S. at 802; *see also Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir. 1985) (finding that where employer ultimately eliminated plaintiff's position weakens inference of discrimination). Here, plaintiff was not replaced by an individual outside of the protected class, but rather plaintiff's position was eliminated, further weakening any possible inference of discrimination. Therefore, because plaintiff fails to present evidence of circumstances giving rise to an inference of discrimination, plaintiff fails to establish a prima facie case of age and national origin discrimination.

### 2. Defendant Provided a Legitimate Explanation

Assuming *arguendo* that plaintiff established a prima facie case of age or national origin discrimination, LIRR provides a legitimate nondiscriminatory reason for plaintiff's termination. Here, LIRR provides two grounds for plaintiff's termination: (1) plaintiff's deficient work performance and (2) the MTA's findings that plaintiff performed work for outside businesses on LIRR time with LIRR resources. Given the "low threshold" that the defendant must meet at this stage, there is no doubt that poor work performance and the findings of an independent investigation are legitimate grounds for plaintiff's termination. *See Gorley*, 2000 WL 1876909, at *6 (finding where MTA investigation revealed plaintiff misappropriated funds constituted a legitimate nondiscriminatory reason for plaintiff's discharge). Moreover, as defendant notes, Porcelain set a

more demanding standard for employees than previously set by her predecessors and plaintiff's level of performance had in fact declined.

### 3. Plaintiff Has Failed to Show Pretext

Once the defendant articulates legitimate nondiscriminatory reasons for the adverse employment action, plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 2106 L. Ed. 2d 105 (2000) (quoting *Texas Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, L. Ed. 2d 407 (1993). In the summary judgment context, the Second Circuit has held that "[t]he ultimate question is whether the employer intentionally discriminated, . . . . '[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" *James v. New York Racing Assoc.*, 233 F.3d 149, 156 (2d. Cir. 2000 (quoting *Reeves*, 530 U.S. at 147). "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors, including: (1) the strength of the plaintiff's prima facie case; (2) the probative value of the proof that the employer's explanation is false; and (3) any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148-49.

The only evidence plaintiff presents to counter LIRR's proffered nondiscriminatory reasons is his assertion that his poor performance review was unwarranted and his own explanations for the MTA's findings. Specifically, plaintiff admits to conducting business for Morellato during business hours but asserts that the defendant did not maintain a policy prohibiting such action and that several of his co-workers engaged in similar action. (Pl.'s 56.1 at ¶ 75.) Plaintiff further alleges that he

returned the money he was paid by Morellato after Braverman called Porcelain and, thus, plaintiff was not obligated to disclose such earnings to the New York State Ethics Committee. (Adia Dep. at 89.) With respect to DiMatteo and MAB, plaintiff explains that he maintained a personal friendship with the owners of DiMatteo and MAB, which was why he received numerous personal phone calls from them. (Pl.'s 56.1 at ¶¶ 80-81.) Moreover, plaintiff alleges that he borrowed financial software from DiMatteo in order to evaluate its usefulness for his work at the LIRR. Plaintiff also asserts that he was not obligated to disclose the money he made from conducting business for DiMatteo because it did not exceed $1,000. (*Id.* at 82).

However, these explanations do not illustrate pretext and, at best, constitute mere excuses for the MTA's findings. Plaintiff's excuses do not explain why DiMatteo's financial records were found on plaintiff's computer and why DiMatteo paid plaintiff between $2000 and $6000 annually between 1996 and 2001. (Def.'s 56.1 at ¶ 80.)

Moreover, Porcelain's ambiguous comments are insufficient to demonstrate that LIRR's proffered reasons for plaintiff's termination were pretextual. *See Molin v. Shapiro*, 73 Fed.Appx. 511, 2004 WL 22056217 *511 (2d Cir. 2004) (holding that an employer's alleged statement that he "ha[d] to pay younger people more because they are the future of the company and [plaintiff] was not" insufficient to prove pretext because it was "susceptible to various interpretations" and not "directly indicative of a discriminatory motive for [plaintiff's] termination." Here, Procelain's comments are even more ambiguous with regard to discriminatory motive than those made by the defendant in *Molin*.

Even assuming that plaintiff's poor performance reviews were unwarranted, plaintiff failed to present evidence that he would not have been fired solely on the basis of the MTA's findings.

Even if the MTA investigation's findings are incorrect, when an employer relies on information in good faith in making an employment decision, there is no statutory violation. *See Gorley*, 2000 WL 1876909, at *7 ("If defendant relied on information [from MTA investigation] in good faith, its dismissal of plaintiff would not violate Title VII.") Plaintiff does not make any allegations of discrimination against the MTA or DiMola. Therefore, even assuming that plaintiff's proposed alternative explanations for the MTA's findings are true, plaintiff's termination would not violate the relevant statutes because DiMola relied upon such findings in good faith.

Accordingly, plaintiff fails to demonstrate that the MTA's findings and his poor performance review were a pretext for discrimination.

### B. Retaliation

Title VII and the ADEA prohibit employers from discriminating against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter . . . " 42 U.S.C. § 2000e-3(a). Retaliation claims under Title VII and the ADEA are also evaluated under the *McDonnell Douglas* burden-shifting framework. *See Hunter v. St. Francis Hosp.*, 281 F. Supp. 2d 534, 546 (E.D.N.Y. 2003).

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence: "(1) participation in a protected activity known to the defendant; (2) an [employment] action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Id*. (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998)). The causal connection between participation in the protected activity and the alleged retaliation can be established by showing "(1) direct proof of retaliatory animus directed against the plaintiff, (2) disparate treatment of similarly situated

employees, or (3) that the retaliatory action occurred close in time to the protected activities." *Id.* at 547.

Plaintiff alleges that his internally lodged complaint with the LIRR in November 2001 and his subsequent EEOC complaint constitute protected activities. However, in order to constitute a protected activity, plaintiff must possess a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). Plaintiff admits that he did not assert age or national origin-based discrimination in his alleged November 2001 complaint to the LIRR. (Adia Dep. at 61-65). Thus, because plaintiff's general complaints regarding his relationship with Porcelain were not "action[s] taken to protest or oppose statutorily prohibited discrimination," the November complaint does not constitute a protected activity. *See Cruz v. Coach Stores, Inc.* 202 F.3d 560, 566 (2d Cir. 2000).

Although filing an EEOC complaint constitutes a protected activity, plaintiff fails to demonstrate the requisite causal connection between the EEOC complaint and his termination. Plaintiff alleges that because MTA investigators questioned plaintiff about the EEOC complaint, LIRR had knowledge of the complaint. (Adia Dep. at 85-86.) Plaintiff further alleges that since he was terminated one week after he filed the EEOC charge, there is a causal connection between his filing of the EEOC complaint and his termination.

While "temporal proximity [may] demonstrate a causal nexus," an inference of retaliation does not arise where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding plaintiff failed to establish causal connection where adverse employment actions were

ultimate product of "an extensive period of progressive discipline" beginning five months prior to plaintiff's EEOC charge); *see also Hunter*, 281 F. Supp. 2d at 547 (quoting *Manz v. Gaffney*, 200 F. Supp. 2d 207, 219 (E.D.N.Y. 2002) (finding no valid basis for retaliation claim where performance reviews issued after filing of notice of claim were consistent with those filed before plaintiff engaged in protected activity.)

Here, prior to plaintiff's EEOC complaint, plaintiff received an "unacceptable" overall performance rating, plaintiff's deficient work performance was confirmed by a peer review committee, plaintiff was placed on probation as a result of his poor performance, and the MTA investigations into plaintiff's non-LIRR business activities were already underway. Thus, plaintiff's termination resulted from a progressive two-month long evaluation and investigation into his poor work performance and non-LIRR related activities at work. *See id.* Under these circumstances, the fact that plaintiff was terminated shortly after filing the EEOC complaint does not give rise to an inference of retaliation.

Furthermore, the mere fact that MTA investigators asked plaintiff why he had "sued" the LIRR does not show retaliatory animus. At best, such inquiries indicate that the investigators knew about the EEOC complaint. However, it does not create a causal connection between the MTA's intent and DiMola's independent decision to terminate plaintiff. Thus, plaintiff fails to establish a prima facie case of retaliation because there is no evidence of a causal connection between the EEOC complaint and plaintiff's termination.

Even assuming that plaintiff established a prima facie case of retaliation, the LIRR articulated a legitimate nondiscriminatory reason for plaintiff's termination and plaintiff failed to show pretext. As indicated above, plaintiff's poor work performance and the MTA's findings

constitute legitimate nondiscriminatory reasons for plaintiff's termination. Plaintiff's proffered excuses do not demonstrate any pretext for retaliation.

## III. Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The complaint is dismissed without costs to either party.

SO ORDERED.

DATED:    Brooklyn, New York
              July 26, 2006

/s/
DORA L. IRIZARRY
United States District Judge